RUSSELL, Judge.
In February 1988 the Alabama Department of Revenue (Department) entered a final assessment against Phillips Petroleum Company (Phillips) for taxes purportedly due under the provisions of §§ 40-20-1 to -13 and § 9-17-25, Ala.Code 1975. Those statutes provide for the levy of a tax on oil and gas valued in their raw and untreated state at the point of production, i.e., severance from the ground at the mouth of the well. The Department’s assessment was levied with respect to gas that Phillips — and other companies for whom Phillips remits taxes— had severed from the Chatom Field in Washington'County, Alabama, where Phillips is a producer of gas and a plant owner and operator. The assessment covered gas produced during an audit period from August 1, 1983, through July 31,1986, and was in the amount of $2,672,960.92, representing.severance taxes, penalties, and interest.
The Department and Phillips later stipulated that the assessment, insofar as it related to a purported tax on sulfur extracted from the gas, was to be reduced by $1,305,-820.75. However, the Department alleged that Phillips owed the remaining amount because Phillips had understated the value of the gas on which the severance tax was computed and paid.
In March 1988, after remitting payment according to the Department’s assessment, Phillips, on behalf of itself and other producers in the Chatom Field, appealed for a refund in the Montgomery County Circuit Court. Phillips claimed that the so-called “work-back method” that the Department had used to value Phillips’s gas (1) was unauthorized by the relevant tax statutes, (2) was a radical and improper departure from a longstanding departmental interpretation of these statutes, and (3) was adopted in violation of the Alabama Administrative Procedure Act (AAPA), §§ 41-22-1 to -27, Ala. Code-1975.
Following an ore tenus proceeding, the trial court entered a pre-judgment order on *882 October 5, 1990, in which it concluded that the Department’s adoption and use of the work-back method did not violate the AAPA. However, the court found that because for a number of years the Department had used a different method to value Phillips’s gas, the Department could not properly change its basis for valuation without warning and prior notification to Phillips. The court determined that the Department had notified Phillips on July 22, 1986, and held that the assessment using the work-back method was proper for the period of time following this date but improper for the period before the date.
In a final judgment entered on November 1, 1990, the trial court held that Phillips was entitled to a refund totalling, with interest, $1,785,965.81. This refund included all payments made by Phillips pursuant to the Department’s assessment, except for taxes due from July 22 through July 31, 1986. The court further held that liability for the refund was to be apportioned among the state, Washington County, and three cities in Washington County. Post-trial motions by both parties were denied. The Department appeals and Phillips cross-appeals.
The parties raise a number of issues; however, we find the following two issues to be dispositive: (1) whether under the relevant oil and gas severance tax statute, the work-back method used by the Department in the 1988 assessment is actually permitted for use in valuing raw gas and (2) whether the state alone, and not the county or cities, should be responsible for paying any refund due to Phillips.
The relevant factual background is as follows: Phillips owns approximately 85% of the treatment plant and the gas produced at the Chatom Field, where Phillips and a number of other companies produce and refine gas. Raw or “sour” gas from the Chatom Field contains hydrogen sulfide and other components that make it hazardous and unusable unless it is treated. As a result of treatment, the sour gas is converted into various marketable products such as natural gas liquids, condensate, butane, residue gas, and elemental sulfur, which are then sold to third parties at the “tailgate” of the treatment plant. Phillips has contracts with several of the other producers in the Chatom Field, under which Phillips agrees to treat gas severed by these producers and then to sell the treated products. Phillips returns a percentage of the aggregate sales proceeds to the producers, and the reverse percentage is retained by Phillips as a “fee” covering various costs to Phillips, including the expense of building and operating the treatment plant and certain risk costs.
It is Phillips’s position on cross-appeal that § 40-20-1(3), Ala.Code 1975, mandates that a “market-value method” be used to value raw gas. Section 40-20-1(3) defines the “value” of raw gas as follows:
“(3) Value. The sale price or market value at the mouth of the well. If the oil or gas is exchanged for something other than cash, if there is no sale at the time of severance or if the relation between the buyer and seller is such that the consideration paid, if any, is not indicative of the true value or market price, then the Department shall determine the value of the oil or gas subject to the tax hereinafter provided for, considering the sale price for cash of oil or gas of like quality.”
In view of § 40-20-1(3), Phillips maintains that the value of its gas should be determined either by the actual price paid by Phillips to the other producers (“sellers”) of gas in the Chatom Field, as evidenced by Phillips’s contracts with these producers, or by the actual price paid by other plant owners to other producers for gas of comparable quality. Phillips used this market-value method when valuing its gas and reporting its severance tax for the 1983 to 1986 audit period, the period that is the subject of the 1988 assessment.
Although the issue is among the factual matters that the Department continues to dispute in this case, the trial court found in its pre-judgment order of October 5, 1990, that “since the Chatom Field first began production in the early to middle 1970s,” Phillips’s gas had been valued “based on a contract with other producers in the field.” Thus the trial court implicitly accepts Phillips’s contention that, until the 1988 assessment, the company’s severance taxes had *883 always been based upon gas values derived by the market-value method. While recognizing that the statutory interpretation that is also material to this case is an issue of law and is not subject to the ore tenus presumption, we note that where evidence as to an issue of fact is conflicting, a presumption of correctness shall be accorded the trial court’s finding. State v. Hickox, 507 So.2d 947 (Ala.Civ.App.1986). We find sufficient evidence in the record to support the trial court’s finding as to the factual issue of the method of valuation used by the Department prior to the 1988 assessment.
Various treatment contracts that Phillips has with other gas producers provide Phillips with fees ranging from 21% to almost 60% of the sales proceeds from the byproducts of the treated gas. The record shows that when establishing the value of its gas (for purposes of the severance tax), Phillips referred to a contract between itself and the other Chatom Field plant owner/producers, under which Phillips retained a 21% fee and returned 79% of the sales proceeds to the producers. This was the highest contractual valuation of raw gas from the Chatom Field. Phillips contended at trial, but does not avidly pursue the argument in its brief, that a “Closing Agreement” the company entered into with the Department in May 1983 provided for the prospective use of the market-value method, with continued reference to the 21/79% contract. (The company now appears to contend that the Closing Agreement was a “memorialization” of the Department’s longstanding interpretation of the severance tax statute, under which interpretation the market-value method of gas valuation was used.)
The derivation of the 21/79% figure provided for in the Closing Agreement — and used in all previous valuations of Phillips’s raw gas — is of great importance to the present case: Phillips maintains that the figure is based on the contract between the company and the other plant owner/producers, as called for by the market-value method; the Department, however, insists that 21% has historically represented an approximation of Phillips’s treatment costs, which were not known before the 1983 to 1986 audit period, and that once Phillips’s actual treatment costs were determined, the Department made certain discretionary adjustments to the actual-cost figure and then plugged the new figure into the work-back formula.
It is the Department’s position that when a gas producer also has a large ownership interest in the treatment plant, as does Phillips, the severance tax statute authorizes the Department to eschew the market-value method and to value this plant owner/producer’s raw gas using the work-back method. Under the work-back method, the Department takes the aggregate sales price of treated gas products sold at the tailgate of the plant and subtracts therefrom the plant owner/producer’s actual treatment costs, as shown by the plant owner/producer’s records.
In the mid-1980s the Department sought to establish Phillips’s actual treatment costs for the August 1983 to July 1986 audit period. The Department would then use what it purported to be an actual-cost figure with the work-back method in order to determine the taxable value of Phillips’s raw gas. After various audits and communications with other oil and gas companies, the Department concluded, it says, that 21% of the sales proceeds overstated Phillips’s treatment costs. The Department therefore based its 1988 assessment on a treatment-cost figure somewhat lower than 21% — which, under the work-back method, meant that the taxable value of Phillips’s gas increased accordingly. When Phillips contested the additional assessment, this action followed.
The Department contends that the severance tax statute grants it considerable discretion and authority to use the work-back method. Specifically, it argues that the three “if’ clauses in § 40-20-1(3) evidence a clear legislative intent to allow the Department alternative valuation methods when the value of raw gas cannot be established by some reliable market indicator. As further support for its argument that the legislature grants it wide discretion in determining the value of gas, the Department cites § 40-20-6, Ala.Code 1975, which provides that the Department is authorized to base its severance tax assessments on “reports received or information acquired from any source” and *884 on “any information coming into [its] possession.” It points out, moreover, that because oil and gas producers are required to keep detailed records concerning the volume, value, disposition, and consideration received for their gas, these records may be relied on by the Department to determine treatment costs for use with the work-back method. See §§ 40-20-4 to -5, Ala.Code 1975.
In addressing the arguments in Phillips’s cross-appeal, the Department emphatically contends that the work-back method is “universally accepted” in the oil and gas industry for use in valuing gas at the wellhead, further contending that the method was especially appropriate for valuing Phillips’s gas. It is the Department’s position that the relationship between the buyers and sellers of gas in this case “is such that the consideration paid [is] not indicative of the true value or market price.” See § 40-20-1(3). Phillips’s gas was not sold at the time of severance, the Department says, and not only was the 21/79% contract on which Phillips based its taxes technically between Phillips and itself, but the plant in which the company has an 85% ownership interest is the only one servicing the Chatom Field producers. Therefore, the Department argues, the company’s contracts with non-plant owner/pro-dueers, inasmuch as they do not arise out of “free-market conditions,” are tainted by “monopoly” and tend to understate the value of the producers’ gas.
The Department also contends that the comparison to sales of like-quality gas— which is called for in § 40-20-1(3) when there is no sale of raw gas after severance or when the consideration given for the gas is found not to be reflective of true market value — is only one means of establishing the value of raw gas but is not necessarily a mandatory method for doing so. In making this argument, the Department puts great emphasis on the word “considering,” as it appears in § 40-20-1(3). When the valuation method outlined in the first part of § 40-20-1(3) is unreliable, the Department says, the sale price of gas of like quality need only be “considered” but is not be to be viewed as a conclusive indicator of the value of raw gas.
We note here that the construction of a statute is a legal question. Phenix City Bd. of Education v. Teague, 515 So.2d 971 (Ala.Civ.App.1987); Galloway v. State ex rel. Payne, 371 So.2d 48 (Ala.Civ.App.1979). Thus, the trial court’s finding that the Department could, without violating § 40-20-1(3), change its basis for valuing Phillips’s gas to the work-back method after notifying the company will be reviewed by this court without any presumption of correctness.
We find that the trial court erred in holding that the Department could properly use the work-back method once it had notified Phillips. Not only is justification for use of the work-back method nowhere found in the relevant statute, but from the plain language of § 40-20-1(3), it is evident to this court that the statute imposes a duty upon the Department to value raw gas either by using the actual sales price of the gas or by considering the sales price of gas of like quality.
Because Phillips and the other companies who are parties to the 21/79% contract are on “both ends” of the transaction in question (i.e., they are both plant owners and gas producers), the Department should have determined whether the consideration paid to the producers under the contract was indicative of the true value or market price of the gas. We note that there remains some factual dispute as to whether, as the Department maintains, the contract was not negotiated at arm’s length and as to whether it fails to reflect the true value of raw gas taken from Chatom Field. The 21/79% contract upon which Phillips reported its severance tax reflected the highest price for raw gas of any of the six or seven contracts placed into evidence at trial. These contracts were for the sale of gas from the Chatom Field or for the sale of like-kind gas near the treatment plant at the field. Thus, Phillips contends, the Department cannot legitimately argue that the producers the company deals with are being paid less than market value for their gas.
Phillips also points out that all gas produced in the Chatom Field and adjacent fields, other than the gas subject to the 1988 assessment, was valued lower than the gas subject to the assessment and that severance *885 taxes were reported and paid to the Department on these lower values. The company maintains, moreover, that contrary to the Department’s assertion, the non-plant owner/producers with whom it also has treatment contracts do have alternatives to dealing with the company, including selling their gas to other treatment plants that are in the area of the Chatom Field or investing in plants of their own, but that the producers who choose to deal with Phillips do so because they receive a fair return from the company. Therefore, Phillips says, the Department could not legitimately refuse to consider these contracts as being reflective of true market value.
However, even if the Department could have legitimately disregarded these contracts when valuing Phillips’s gas, § 40-20-1(3) provides that in circumstances where the relationship between the seller and buyer is such that the sales price does not reflect the true market value of raw gas, the value of the gas “shall” be determined “considering the sales price for cash of oil or gas of like quality.” The evidence conclusively shows that the Department did not look to like-kind sales to establish the value of Phillips’s raw gas; rather the Department’s auditor simply applied the work-back method, using what the Department says were Phillips’s actual treatment costs as a basis for determining the “value” of the gas and thereby circumventing the duty imposed by § 40-20-1(3).
While the Department correctly asserts that § 40-20-4 of the oil and gas severance tax statute requires oil and gas companies to keep detailed records concerning their gas and that § 40-20-6 provides that the Department is authorized to assess taxes “based on reports received or information acquired from any source,” we find that these provisions are clearly meant to be read in para materia with § 40-20-1(3). That is, the reports and information are to be used when applying the market-value method — the only method of gas valuation provided for in the oil and gas severance tax statute. Nowhere in § 40-20-4 or in § 40-20-6 is mention made of the recording of treatment costs for use in valuing gas. Nor is any mention made of the work-back method of valuation.
Because we find that § 40-20-1(3) clearly mandates the use of the market-value method and that the work-back method is not permitted for use in valuing raw gas under the statute, we hold that it was error for the trial court to hold that the Department could use the work-back method of assessment, even after it notified Phillips. Therefore, we reverse the trial court as to this part of its judgment and hold that Phillips is due a refund for all severance tax paid under the additional assessment of February 1988.
Phillips also claims in its cross-appeal that the trial court erroneously held that liability for the refund was to be apportioned among the state, Washington County, and certain cities in Washington County. Phillips argues that the state alone is responsible for refunding the entire amount the company paid under the Department’s 1988 assessment. We agree.
Section 40-2-22, Ala.Code 1975, which pertains to appeals from final tax assessments, provides in pertinent part as follows:
“[T]he court ... shall ascertain and determine by its judgment, the amount of tax which was invalid or which was excessive both as to the amount paid to the state, counties ... or other governmental agencies receiving any part of such taxes; and, upon presentation of a certified copy of the judgment to the comptroller, it shall be the duty of the comptroller to draw his warrant on the treasurer in favor of such taxpayer for such an amount as the judgment of the court shall ascertain and declare has been erroneously paid to the state ... and such warrant of the comptroller shall be paid out of any funds in the . treasury as a current obligation in the year in which said refund is ordered.”
Although the state claims to have later allocated a portion of Phillips’s tax dollars to the county and municipalities, Phillips paid the amount of the disputed assessment directly to the state, as required by the statute. The money was not received by the county and cities as taxes, but was received by the state as a “protested payment” necessary to perfect Phillips’s statutory appeal. It is there *886 fore the obligation of the state to satisfy the judgment.
Accordingly, we reverse the judgment of the trial court as to this issue and hold that it is the obligation of the state alone to refund the entire amount that Phillips paid under the contested 1988 assessment. We preter-mit as unnecessary a discussion of other issues raised in the parties’ appeal and cross-appeal.
REVERSED AND REMANDED.
ROBERTSON, P.J., and THIGPEN, J., concur.